[No. 2878.]

## G. J. Spear v. The State.

1. Practice Continuance—Bill of Exceptions.—Objection that the trial court erred in refusing an application for a continuance must be presented by bill of exception. Otherwise, the question will not be considered by this court.

2. SAME—PRESENTMENT OF INDICTMENT.—Under the Revised Code (Article 415, Code of Criminal Procedure), it is not required that the entry on the minutes of the court of the presentment of the indictment should show the offense charged. See the statement of the case for an entry of the presentment of an indictment which, being sufficient, no amendment of it was necessary.

3. SAME—JURY LAW.—When, upon his *voir dire*, a proposed juror answers that there is established in his mind as to the guilt or innocence of the defendant a conclusion that will influence his verdict, he should be peremptorily discharged. Such an answer is not only a ground of challenge for cause, but is an absolute disqualification. See the opinion *in extenso* on the question.

4. SAME—PRIVILEGE OF COUNSEL.—See the opinion *in extenso* for remarks of State's counsel, in argument, *held* not to amount to an abuse of privilege.

5. SAME—EVIDENCE—ENFORCEMENT OF "THE RULE" AS TO EXPERT WITNESSES.—Professional physicians being called to testify solely as medical experts, it was proper to exempt them from the operation of "the rule." Moreover, the enforcement of the rule as to the sequestration of witnesses is matter largely committed to the discretion of the trial judge, and one which will not be revised unless injury to the defendant is made manifest.

6. MURDER.—CHARGE OF THE COURT, in a murder trial, instructed the jury as follows: "If you believe from the evidence that a man was killed, yet unless the evidence of his identity as being Nathan Wurmser satisfies you that it was Nathan Wurmser, you will acquit. In determining this identity you will consider the entire evidence, and the attendant circumstances." It is objected that this charge did not confine the jury to the evidence, but authorized them to look beyond it to attendant circumstances. *Held*, that the charge of the court is not to be so construed.

7. SAME—EVIDENCE—FACT CASE.—See the statement of the case for circumstantial evidence *held* sufficient to support a conviction for murder in the first degree.

APPEAL from the District Court of Blanco. Tried below before the Hon. L. W. Moore.

The indictment charged that the appellant did, in the county of Blanco, State of Texas, on the eighth day of August, 1879, of his own express malice aforethought, kill and murder one Nathan Wurmser, by striking the said Nathan Wurmser certain mortal blows on the head, with a deadly weapon, the name or character of which was to the grand jurors unknown. The appellant was brought to his trial at the September term, 1883, of the Blanco county district court, was convicted of murder in the first degree, and his punishment affixed at a life term in the penitentiary.

William Morris was the first witness introduced by the State. He testified that he lived in Cooke county, Texas. He knew the defendant and a man named Wurmser, both of whom lived in Cooke county in the year 1879. The defendant and Wurmser left the witness's house, in Cooke county, Texas, about the first day of April, 1879, to make a trip to southwest Texas. They left, together, traveling in a wagon drawn by a pair of mules. They took with them, also, a small dun pony about thirteen or thirteen and a half hands in height. They had in the wagon several sacks of flour, some tobacco boxes, and a number of other boxes, the contents of which were unknown to the witness. They had with them, also, a show case filled with notions. All of this property belonged to Wurmser, and the defendant had no interest whatever in any part of it that the witness was aware of. Witness had never seen Wurmser since the day he left the witness's house, in Cooke county, in April, 1879.

About the last day of August, or the first day of September, 1879, the defendant returned to the witness's house, alone. He brought with him a hack drawn by a roan horse and a sorrel mare. He had with him, also, the dun pony that belonged to Wurmser, and which he and Wurmser took off in April preceding; also, a saddle that belonged to Wurmser, and which was taken along when he and Wurmser left Cooke county. The defendant told the witness that Wurmser became dissatisfied and left him at Fort Concho, to go with a party to Mexico; that Wurmser took his mules and wagon with him, and left him, defendant, the pony on his wages. The witness had known the defendant about three years, in August, 1879, and Wurmser about one year. When the defendant first came to the witness's neighborhood, he taught a five months' school. He followed no particular business after he gave up his school. When he, defendant, first came to that neighborhood, he dressed elegantly, but at the time he left, and for some time previous, he dressed poorly. Wurmser was a German peddler, who had been merchandising in the section of country including and adjacent to the witness's neighborhood for about twelve months. Witness did not know how much money he had. He was a low, heavy set man, broad shouldered, full chested, and about five feet six or seven inches in height. His hair was of auburn color—between a red and black—was generally kept close cut, and was inclined to curl. Defendant had sore eyes, both when he left and when he returned to witness's house. The distance between

Blanco and Cooke counties is about four hundred miles, and it would take a person, in a two horse hack, ten or fifteen days to make the trip.

Cross-examined, the witness testified that the defendant brought nothing back to Cooke county that had belonged to Wurmser, that witness saw or knew of, except the dun pony and the saddle. The saddle was worth no more than three or four dollars. The defendant went direct to the witness's house when he returned from his southwestern trip, and remained at witness's house for some time, and assisted the witness to make hay. Defendant broke his hack down before he got to witness's house, and left it. Witness went back with him for it. He, defendant, and witness's wife traded hacks, the agreement being made in the trade that the witness should pay for the repairs on defendant's hack. The defendant had no money when he returned, that he, the witness knew anything about. Witness received information, while the defendant was at his house, that the defendant was suspected of the murder of Wurmser. Upon receiving this information, the witness and his wife searched among defendant's things for any article that might have belonged to Wurmser. They searched through his trunk, which was opened with a key that belonged to witness's wife. They found nothing they could identify as having belonged to Wurmser. In the defendant's trunk were two or three new overshirts, three or four undershirts, and some other articles. He, defendant, had a pair of gray pants, which he said he bought in Austin. The pants were too long for him, and when he put them on to wear to a picnic on one occasion, Mr. Vance pinned them up in witness's presence.

Ed. Gibbs was the next witness for the State. He testified that he was a resident of Cooke county, Texas, and resided there in 1879. He knew the defendant; knew him in 1879, and in that year knew one Nathan Wurmser. He saw the defendant and Wurmser when they left William Morris's, in Cooke county, to go to west Texas together, in 1879. Wurmser had a wagon, a pair of mules and a small dun pony. The defendant had no property that the witness knew anything about. It was the understanding that Wurmser was going to west Texas on a peddling expedition, and that the defendant was to accompany him. Wurmser had been merchandising in the witness's neighborhood, in Cooke county, for some little time. On his last trip to that neighborhood, he had about one thousand dollars worth

of stock, which he sold out before he started on his trip to the southwest. Witness had never seen Wurmser since he left Cooke county, in April, 1879. The witness saw the defendant on the morning after he got back to Cooke county. This was about the last of August or first of September, 1879. He then had a roan horse, a sorrel mare, a hack, and the dun pony Wurmser had taken off with him. Witness asked defendant how he came by that property, and defendant told him that he taught a writing school and earned some money, and won the other money, gambling, with which he purchased it. Some days after this, the witness saw the defendant and other parties gambling in Morris's horse lot. Defendant lost what money he had with him, and went to the house to get more money. He returned shortly with a roll of greenback money half as large as a man's wrist. From this roll he took a ten dollar bill. Witness did not observe the denominations of the other bills. Defendant dressed well when he first came to the neighborhood and taught school. He had some money at that time. After he quit teaching, he took to drink and gambling. When he left with Wurmser, he was shabbily dressed. When he came back, he was well dressed, continued to dress well as long as he remained, and appeared to be well supplied with money. After he came back, the defendant traded his two horses with the witness's brother, receiving twenty-five dollars in money as boot.

J. P. Cross was the next witness for the State. He testified that he resided in Cooke county in 1879. He then knew the defendant and Nathan Wurmser. Wurmser lived at the house of the witness for about ten months prior to his leaving Cooke county for southwest Texas. On the eighth day of April, 1879, the witness left his home in Cooke county on a trip to west Texas in search of a ranch. When the witness left home, Wurmser and defendant were both in Cooke county, but were making preparations for the trip they subsequently left to make. Wurmser had been merchandising for about a year in that neighborhood. Witness in that time had made many purchases for him, and in casting up accounts for a settlement a few days before witness left on his trip west, the account showed a balance in favor of Wurmser for twenty-eight and a half dollars, for which the witness executed his due bill and gave to Wurmser. Wurmser was a German, about five feet six or seven inches high, heavy set, with dark curly hair, cut short. He had

a dark beard, and was from forty to forty-five years old. His teeth were somewhat peculiar, the front teeth being much protruded. There was a space between the two front teeth large enough to admit the passage of a knife blade. The tooth in front of and next to the eye tooth on the left side had been extracted by Doctor Ing while Wurmser lived at witness's house.

The defendant is a tall and slender man, is about six feet high, has dark hair and mustache, and stands very erect. His eyes were sore when he left Cooke county in 1879. If the defendant had any property when the witness left Cooke county in April, 1879, witness had never heard of or seen it. The defendant taught school for the first five months after he came to the neighborhood, and during that time dressed well. He was without regular employment for some time before he left with Wurmser, and during that time he dressed poorly. During this latter time he drank and gambled a great deal. For a short time he worked at a cotton gin for the witness. When he went off with Wurmser he was poorly dressed and had no property.

When he lived at witness's house Wurmser owned a small dun pony, a silver watch and a hair watch chain. The defendant returned to Cooke county late in August or early in September. He then had in his possession a hack, a sorrel mare, a roan horse, the dun pony, and a saddle which Wurmser owned when he lived at witness's house. The witness also saw in the defendant's possession, a day or two after his return, a silver watch and hair watch chain which he took to be the same Wurmser owned when he lived in Cooke county. The defendant, when he returned, was well dressed and had some money. Witness had a conversation with defendant about Wurmser. He told the witness that Wurmser had gone to Mexico; that he, defendant, taught school, and with the money thus earned bought the property he brought back with him. At another time he told witness that he got into a game with Wurmser and won some of the property. At another time, shortly after the defendant's return, witness saw him wearing a pair of pants that witness took to be a pair of pants that Wurmser had owned when he lived at witness's house. They were smooth gray pants. Defendant had the legs stuck into his boots when witness saw him wearing them. They were so much too short for the defendant that they would not stay in, but continually worked out of the boots. On the twenty-second day of October, 1879, the defendant presented to the witness for payment his, wit-

ness's, due bill to Wurmser. Witness paid it, and the defendant receipted the same on the back. This instrument was produced in evidence, and read as follows:

"Saddler's Bend, Cooke County, Texas,
"April 2, 1879.
" Due N. Wurmser the sum of twenty-eight dollars and fifty-two cents, $28$\frac{52}{100}$, for value received."

The witness testified that he had torn off his signature.

This instrument was receipted on the back as follows:

"Received of J. P. Cross, payment in full. This 22d day of October, A. D. 1879.
(Signed)          "G. J. Spear."

Cross-examined, the witness could not swear that the gray pants worn by the defendant on the occasion spoken of were the identical pants he saw previously in the possession of Wurmser. He had no recollection of seeing the defendant at a picnic wearing those pants. The pants he had seen in the possession of Wurmser before he left Cooke county, and which he took to be the same pants the defendant wore on the occasion referred to, had been worn occasionally by Wurmser while he lived at witness's house. The watch which the witness saw in the possession of the defendant after he returned to Cooke county was a watch which the defendant at one time owned, and had traded to Wurmser for a shot gun and some little money in boot—witness did not know how much, but it was only a few dollars. Witness did not know that Wurmser had paid defendant this boot money before they left Cooke county. Defendant had the shot gun a few days before he and Wurmser left Cooke county, but the witness did not know whether or not he took the gun with him. He did not bring the gun back. The defendant clerked for Wurmser some time before the two went off on their southwestern trip. Witness was not at home when defendant and Wurmser left, and consequently knew nothing about what they took with them. Defendant told the witness that Wurmser gave him the due bill in settlement.

H. Henigen was the next witness introduced by the State. He testified that he was a resident of Cooke county, Texas, in the year 1879. He knew the defendant, and he knew Nathan Wurmser. When the defendant returned to Cooke county from the southwest in August or September, 1879, he had with him a sil-

ver watch and a hair watch chain, which the witness recognized as articles that Wurmser owned and took with him when he left Cooke county. The defendant also had a pistol which the witness recognized as a pistol that Wurmser owned and took with him when he left Cooke county the preceding April. The defendant told the witness that he got the watch, chain and pistol from Wurmser. Witness had never seen Wurmser since he left Cooke county in company with the defendant in April, 1879. Defendant had no property when he left Cooke county with Wurmser, in April.

Cross-examined, the witness testified that the pistol referred to was a pocket weapon. Speaking to witness about it, the defendant told him that Wurmser purchased a larger pistol for himself, and gave this one to him, as a present. He told the witness that he got the watch from Wurmser, but if he told witness how, or by what kind of a transaction, the witness had forgotten it. The witness was of opinion that the defendant had once traded that watch to Wurmser. The witness did not remember that the defendant told him, at any time, that he had traded the watch to Wurmser for a shot gun and four dollars, and that Wurmser failed to pay the four dollars, and that they cancelled the trade by resuming their respective properties.

William Bluitt next testified, for the State, that he lived in Cooke county in 1879. He knew that the defendant and Nathan Wurmser left that county together. The witness had a distinct recollection of the defendant's return to that county. He brought back with him a pistol which the witness thought he recognized as one owned by Wurmser before he left Cooke county. Witness asked defendant about the pistol, and defendant said that Wurmser gave it to him.

Emil Herrman was the next witness for the State. He testified that during the year 1879 he was working in a livery stable in the town of Blanco. One day, two men drove up to the stable in a hack, and purchased some corn and top fodder from the witness. One of these men was tall and slender, the other shorter and heavy set. The tall man had dark hair and whiskers; the shorter man had light hair and whiskers. The witness took the short man to be a foreigner, as he spoke with a brogue. The hack was drawn by two horses. A small dun pony, in very bad order, was tied to and led behind the hack. The occupants of the hack inquired the way to San Marcos. The witness gave them directions, and they started off from the sta-

ble in the direction of San Marcos. The witness did not remember the time of day when the men were at the stable. About a week or ten days after these men were at the stable, the witness heard of the discovery of the body of a dead man on the Little Blanco river. Witness could not swear that the defendant was one of the men who stopped at the stable and purchased the corn and fodder. He could not say that he resembled either of them.

The next witness for the State was G. W. Palmer, who testified that he lived in Blanco county. On the eighth day of August, 1879, the witness was on his return home from the city of Austin. On the Blanco and San Marcos road, about a mile from where that road crosses the Little Blanco river, he met two men driving a hack drawn by two horses, one a roan horse, and the other a sorrel mare. They stopped the witness, and asked him to direct them to a good camping ground on the road. Witness directed them to cross the Little Blanco river; that a little above the crossing they would find good water, and a little below they would find good grass and a good camping place. Witness offered to trade horses with them, but they declined, saying that their team worked well together, and they would keep them. One of these men was tall and slender, about six feet in height. The other was a lower and heavier set man, with dark hair and beard. He was about five feet six or eight inches high. This was only the witness's opinion, as he did not see him stand up. He and the tall man were sitting in the wagon together, the tall man driving. Witness had no conversation with the short man, but, from his appearance, took him to be a foreigner. The tall man wore a mustache and chin whiskers, a shade lighter in color than the short man's. The witness positively recognized the defendant as the tall man who was driving the wagon, and with whom he had the conversation detailed. Witness was absolutely certain that the defendant and the tall man were one and the same. Witness noticed the tall man's eyes, but not the color of them. He had sore eyes, one much sorer than the other.

When the two men started on, after the conversation detailed, the witness noticed that they had a small dun pony tied behind the wagon. Witness had not seen this pony before, because it was grazing on the side of the hack opposite to where witness stood. The pony got one foot over the rope, to which fact the witness called the men's attention, when one of them got out

and relieved it. Witness never saw that man—the tall man whom he recognized as the defendant—afterward, until he was brought back to Blanco county in June, 1883. Witness then saw him and instantly recognized him as the tall man he saw and conversed with as stated, on the Little Blanco river, on the eighth day of August, 1879. It was late in the evening, about an hour before nightfall, when witness met the men. The body of the dead man was found on Little Blanco river, one week from the day after the witness met the two men in the hack as deposed to. A heavy rain fell about midnight on the night of the day on which witness met the parties described.

Cross-examined, the witness stated that his conversation was conducted with the tall man altogether; and that man he positively identifies in the defendant. He did not hear the other man speak at all. The tall man merely said that he did not want to trade horses; that while his did not match in color, they worked well together, and he would not separate them.

Ben. F. Palmer testified, for the State, that he was the son of the last witness, and was with his father on his return from Austin in 1879, when they met the two parties in the hack on Little Blanco river. Witness did not notice the color of their horses. They had a pony tied behind the hack. While his father was talking to the men, witness saw a little black dog sitting in the back part of the hack.

J. C. Breed was the next witness for the State. He testified that in August, 1879, he lived near Fisher's store, on the road between that point and the city of Austin. The Austin and Fisher's store road leaves the Blanco and San Marcos road at Fisher's store. Witness lived about three hundred yards from the store. The witness heard of the discovery of the dead body of a man on the Little Blanco one Sunday in August, 1879. On Saturday morning, nine days before the witness heard of that discovery, he was up early, feeding and milking his cows. While standing on the road, having temporarily suspended his work, the witness was passed by a man in a hack going toward Austin. He was driving a roan and a sorrel horse to the hack, and leading a dun pony tied to the rear of the hack. The man was tall and slender, and wore dark hair and whiskers—mustache and chin whiskers. Witness was standing immediately in the road, and, as he expected the man to speak to him, noticed him particularly. The man did not speak to witness, nor did he turn his face toward witness. The back curtain of the hack

was up, the side curtains were loose and flapping, enabling the witness to see into and through the hack. He saw a small black dog, a saddle, some camping utensils and bedding in the hack. Had another man been in the hack at that time, the witness would have seen him, unless he had been lying down perfectly flat and concealed by the bedding. In that way it was possible that a man could have been so concealed in the hack that witness could not have seen him. Witness could not positively swear that the defendant was the man who drove that hack, though he looked very much like him. Daylight was just breaking when the man in the hack passed the witness. He was driving very hard, and seemed to be in great haste. A heavy rain had fallen the night before and the roads were very muddy. About a mile from where the witness saw the man and the hack there was a dim road leading off to the right, and going back into the San Marcos and Blanco road. From the place where the witness saw the man in the hack, back to the crossing of the Little Blanco, on the San Marcos and Blanco road, the distance was about five miles.

Leo Watts testified, for the State, that in August, 1879, about a week before the discovery of the body of a dead man on Little Blanco, he met a man driving a hack drawn by two horses, with a dun pony led behind, traveling in the direction of San Marcos. This was on Saturday or Sunday, a little after sun up; and the point at which witness met him was about four and a half miles from and beyond Fisher's store. Witness was traveling in a wagon. The man turned out of the road, turned his face from witness, and passed without a word. The curtains on the side of the hack next to witness were up, and those on the opposite side and behind were down.

Libe Watts testified, for the State, that in August, 1879, he was on the Little Blanco, stock hunting, at a point about two hundred yards below where the San Marcos and Blanco road crosses the Little Blanco. At that point, the witness found where something had been buried in an old cow trail which led down the bank of the river. Upon examination, the witness discovered the knee and foot of a human being. Witness went forthwith to Blanco City, notified the authorities, and returned with them to the body.

C. L. Pruitt was the next witness for the State. He testified that he was one of the coroner's jury that sat in inquest over the body of a man found on the Little Blanco river, some time

in August, 1879. The body was found on the banks of the Little Blanco, about two hundred yards below the San Marcos and Blanco City crossing. It was buried in an old cow trail that had washed out, and was covered with dirt, rock, and brush cut from surrounding bushes. This brush appeared to have been cut about six or eight days. The dirt with which the body was covered had been cut from a neighboring bank, the instrument used being, evidently, an ax. Witness and the party with him disinterred and examined the body. The top of the head had been crushed in with a blunt instrument of some kind. The body was that of a stout, heavy set man, of about five feet six or seven inches in height, dark skin, hair and whiskers, the latter wavy and cut short. The tooth next to and in front of the eye tooth, on the left side, had been extracted. The front teeth were larger and longer than the others, and protruded considerably. There was a large space between the front teeth. A place where parties had camped was found near by, and it was discovered that top fodder had been fed to the horses. From the appearance of the ground, it was evident that rain had fallen since the body was buried. The flesh was gone from one foot and knee, and partly from the face. The party buried the body about ten steps from where it was found. The witness, on the day of this trial, pointed out the grave to W. J. Jackson, sheriff of Blanco county.

W. A. Wright, another member of the coroner's jury, testi-·fied, for the State, that he examined the ground in the vicinity of the place where the body was found for wagon or hack tracks leading from the road to the camp, but could find none. He did find, however, at the camp hack or small wagon tracks, where the vehicle had stood, and traced it thence into the San Marcos road. The track was that of a hack or small wagon, drawn by horses, and was made during or immediately after a rain.

Doctor W. J. Ing was the next witness introduced by the State. He testified that he resided in Cooke county, Texas, and resided there in 1879. Witness was a practicing physician. He knew one Nathan Wurmser. In March, 1879, a short time before Wurmser left Cooke county, he came to the witness's office, to have a tooth extracted. The witness extracted for him his tooth in front of and next to the eye tooth, on the left side. After pulling this tooth, the witness noticed a very peculiar formation of Wurmser's head, and, for that reason, examined it critically.

He found that the left side of the head, back of the ear, was deficient and very much depressed, while on the opposite side there was a large projection, as though the skull had been pressed to the right. The right side of the skull, back of the ear, extended one and a half or two inches further from the centre of the skull than did the other side. It was such a skull formation as the witness had never before seen in his active practice of thirty-five years. Another peculiarity about the skull was that it receded remarkably from the eyebrows. This skull was of such peculiar formation that a person examining the head of the living man could have readily recognized the skull after death. Wurmser's upper front teeth were wider and larger than common, and protruded very much. The space between the two upper front teeth was wide enough to admit the passage of a knife blade.

Since the witness's arrival in Blanco county, and during the present term of the court, he had been shown the skull of a human being in the possession of W. J. Jackson, sheriff of Blanco county. The witness examined it critically and minutely, and found that it had all the peculiarities witness observed in the formation of the skull of Nathan Wurmser. The forehead, from the eyebrows, receded very much. The marked depression on the left side of the skull, just as it was on the left side of Wurmser's skull, was there. The upper front teeth of the skull corresponded in every particular with those of Nathan Wurmser. The teeth in the skull were all intact, except the tooth immediately next to and in front of the eye tooth, in the left jaw, which missing tooth had been extracted before death, as shown by the fact that the cavity and the bone had entirely closed up and healed. Upon examination, the witness readily identified this skull as that of Nathan Wurmser. Witness had known Wurmser about a year before he left Cooke county, and, after his first examination of Wurmser's head, had frequently noticed the peculiar formation of his skull.

Doctor Thomas G. Edwards testified, for the State, that he was a practicing physician, resident of Blanco county, Texas. During the present term of the district court, the witness was shown and examined a human skull in the possession of sheriff Jackson. The forehead of that skull receded very much, beginning at the eyebrow. There was a marked deficiency and depression on the left side of the skull, back of the ear, and on the opposite or right side of the skull, back of the ear, there

was an equally marked convexity. The skull on the right side measured one and a half or two inches more from the centre of the head than it did on the left. Witness had never, in a long professional career, nor in the many museums he had visited from time to time, seen such a peculiar skull formation. This skull was so peculiar in formation that a person who had seen it in life would have no difficulty whatever in recognizing it after death. Witness also examined the teeth. The upper front teeth were larger than common, with considerable space between them, and they protruded very noticeably. The testimony of Doctor A. V. Duncan, a practicing physician of Blanco county, was substantially the same as that of Doctor Edwards.

W. J. Jackson, sheriff of Blanco county, testified, for the State, that the skull examined by Doctors Ing, Edwards and Duncan was taken from the grave on Little Blanco river, shown to witness by the witness C. L. Pruitt.

Lum Johnson testified, for the State, that he was the sheriff of Cooke county, Texas. For several years the witness had in his hands *capiases* from Blanco county for the arrest of the defendant. Witness arrested the defendant some time in June, 1883, in the Indian Territory, where he was living and going under the name of George Johnson. After defendant was arrested, he told the witness that his name was George Johnson Spear, and that he had left off or dropped off the Spear. At this point the State closed.

William Morris was the first witness called for the defense. He testified that Wurmser had auburn hair, and wore it cut short. It was inclined to be curly, and looked rough. The defendant remained at the witness's house in Cooke county after he returned in August, until the next spring. On one occasion the witness saw the defendant wearing a pair of gray pants with raised cords. They were too long for him and were pinned up to shorten them. Defendant told the witness that he bought the pants in the city of Austin.

William Bluett testified, for the defense, that he knew when the defendant left Cooke county to go to the Indian Nation. The defendant was arrested upon the charge of theft of a pistol, and was taken to Marysville. The officer who arrested him gave him a bond to take down to be signed by sureties. The defendant told the witness that he dared not to stand trial at that time, and that he could not make a bond in Marysville. He then asked witness to get his horse for him, which the witness

did, and he left. Witness did not see him again until after his arrest upon the charge now being tried. Witness told defend-ant, one or two days before he went to the Nation, that he was suspected of the murder of Wurmser. This all occurred in August or September, 1879.

John C. Goar testified, for the defense, that he lived in Blanco county, about three miles distant from where the dead body was found on Little Blanco river. Three or four days before the body was discovered, the witness heard some one screaming as if in distress. These sounds of distress came from the direction in which the body was found. The witness thought the screams came from the house of a neighbor, about three-quarters of a mile distant, in the direction of where the body was found. The screaming could not have been as far off as where the body was found, as the witness could not have heard it at that distance. Witness and his wife went out of their house and listened to the cries spoken of. The witness afterward ascertained that the cries did not proceed from the neighbor's house spoken of. He had never heard anything more about the screaming.

Doctor Stips testified, for the defense, that he lived in Goliad county. In August, 1879, a man named Tim Hart left that county (Goliad) to go out to the western counties to buy land. That man had never been seen or heard of since, though dili-gent search for him had been made. Hart had a large supply of money with him. He was a heavy set man with dark skin, hair and whiskers, and was about forty or forty-five years of age. Hart lived in the town of Papalote, where his wife still lives.

John Robinson testified, for the defense, that he lived in Blanco City in August, 1879. On the day spoken of by Emil Herrman, one of the State's witnesses, the witness saw two men at the stable buying feed. He passed by the two men, but took no special notice of them. He did not know whether or not the defendant was one of those men.

The motion for new trial presented the questions considered in the opinion.

*W. W. Martin* filed an able brief for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. There is no bill of exception in the record

to the action of the court overruling defendant's application for a continuance, wherefore we will not consider the same. (*Cone* v. *The State,* 13 Texas Ct. App., 483; *Bohannon* v. *The State,* 14 Texas Ct. App., 271.)

2. It is not required that the entry upon the minutes of the court of the presentment of the indictment of the grand jury should state the offense charged. (Code Crim. Proc., Art. 415; *Hasley* v. *The State,* 14 Texas Ct. App., 217.) In this case the original entry of the presentment was in full compliance with the law, and the amendment of the same was unnecessary. It was not error to overrule the defendant's motion to set aside the indictment upon the ground that the presentment thereof had not been properly entered upon the minutes of the court.

3. It was not error for the court to discharge Gid Thorp from the jury. Upon examination as to his qualifications to serve as a juror in the cause, he stated under oath that there was an established conclusion in his mind as to the guilt or innocence of the defendant, that would influence his verdict. Having thus answered, the law says emphatically "he shall be discharged." (Code Crim. Proc., Art. 636, subdiv. 13.) We are of the opinion that when a juror thus answers, it is not only a ground of challenge for cause, but it absolutely disqualifies him as a juror in the case, and it is the duty of the court to stand him aside, whether challenged or not. It is true that in specifying who are disqualified to serve as jurors, the Code does not include one who has thus an established conclusion in his mind (Code Crim. Proc., Art. 631), but makes such conclusion a cause for challenge. We are of the opinion, however, that when the law says, as it does, that when the proposed juror answers affirmatively that there is established in his mind such a conclusion as to the guilt or innocence of the defendant as will influence him in his action in finding a verdict, *he shall be discharged,* that this is a peremptory mandate, which the trial judge would not be at liberty to disregard, but must of his own motion stand the juror aside. In the formation of a jury, the great object of the law is to obtain jurors who are impartial, who have not prejudged the case, and who are prepared to render their verdict upon the evidence and the law of the case, uninfluenced by any other consideration. This object would not be accomplished if persons whose minds were fixed as to the guilt or innocence of the accused were permitted to serve as jurors. We do not think that the defendant has any cause to complain of this action of

the court. It does not appear that his rights were in any way injured or prejudiced thereby.

4. We can perceive nothing reprehensible in the remarks of the district attorney complained of, and presented by bill of exceptions. These remarks were made by the district attorney in his argument to the jury, and were as follows: "We are not permitted to exhibit the skull before you. Would to God that you could have that skull before you." This was merely giving a reason why the skull of the deceased was not before them, and expressing a wish on the part of the district attorney that the jury could view it. How these remarks could reasonably be supposed to prejudice the defendant we cannot conceive. It appears from the bill of exception that the court promptly checked the district attorney upon objection made to these remarks, and directed the jury to give no heed thereto. We think this objection without merit and frivolous.

5. Doctors Duncan and Edwards were excused from being placed under the rule as witnesses. They were permitted to testify as experts in the case, after hearing the testimony of Doctor Ing, another witness who testified in the case as an expert. We see no error in this. The enforcement of the rule as to witnesses is a matter largely within the discretion of the trial judge, and his action with respect thereto will not be revised by this court unless it be made to appear that the judge has abused the discretion confided to him. Besides, these witnesses were medical experts, called to testify solely as such, and it was proper practice to not apply the rule to them. (*Johnson* v. *The State*, 10 Texas Ct. App., 571.)

6. We are of the opinion that there is no error in the charge of the court. That portion of the charge specifically objected to is as follows: "If you believe from the evidence that a man was killed, yet unless the evidence of his identity as being Nathan Wurmser satisfies you that it was Nathan Wurmser, you will acquit. In determining this identity you will consider the entire evidence *and the attendant circumstances.*" It is contended that this did not confine the jury to the *evidence,* but permitted them to look outside thereof to *attendant circumstances.* To our minds this is a strained construction of the paragraph, even when considered without reference to other portions of the charge. But, even if this construction could reasonably be placed upon it, when the charge is viewed as a whole, as it should be, it is manifest that the jury were in-

structed that they must look alone to the evidence before them in considering the issues to be found. We think the charge of the court is in all respects unobjectionable, and could not have been misunderstood by the jury.

7. In regard to the sufficiency of the evidence to support the conviction, we must say that we have never known a case wherein guilt was more conclusively established by circumstantial evidence. We commend the able district attorney who conducted this prosecution for the great care and consummate skill exhibited by him in developing so thoroughly and satisfactorily the numerous links constituting the complete chain by which deserved punishment will be fastened upon the defendant for committing the meanest of all murders, a murder the motive of which was to possess himself of his victim's property.

The judgment is affirmed.

·Affirmed.

Opinion delivered May 3, 1884.